ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Steven G. Rawlings
Lee A. Greenwood
Daniel Loss
Suzanne M. Bettis
Joshua D. Tannen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
212-336-5571 (Loss)
LossD@sec.gov

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
JUL 17 2023
AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

1:23-mc-24
LEK/DJS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>-against-<br><br>LEGEND VENTURE PARTNERS LLC,<br><br>               Defendant. | **COMPLAINT**<br><br>23 Civ. 5326<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Legend Venture Partners LLC ("Legend") alleges as follows:

**SUMMARY**

1. This emergency action relates to Legend's use of a network of unregistered sales agents to engage in illegal, unregistered offerings of securities in investment vehicles that purportedly provided access to shares ("Pre-IPO Shares") of private companies that Legend told investors were likely to undertake a public offering in the near future ("Pre-IPO Companies"). But Legend procured investor funds by fraud, falsely telling investors that the firm would only make money when investors made money—after the Pre-IPO Companies went public—and that the investors

would pay no upfront fees or commissions. Contrary to these representations, however, investors were in fact charged exorbitant upfront markups on all investments, allowing Legend's principals and unregistered sales agents to pocket millions of dollars before investors made a dime.

2. From approximately February through October 2022, Legend raised more than $35 million from more than 300 investors located across the country, including in this District, and internationally. In exchange for their investments, investors received interests in a subdivision (called a "Series") of one of five investment funds ("Legend Funds"), which were structured as limited liability companies. Legend told investors that each Series invested in Pre-IPO Shares of a particular Pre-IPO Company. Legend pitched investments in the Legend Funds as a way for retail investors to access limited-supply Pre-IPO Shares that were not yet available on a public stock exchange, and to purchase such shares at a lower price than what Legend claimed was implied by supposedly then-recent valuations of the Pre-IPO Companies.

3. Legend was an outgrowth of another unregistered broker-dealer that marketed Pre-IPO Shares, StraightPath Venture Partners LLC ("StraightPath"), which is the subject of a previously filed enforcement action and is currently under receivership. *See SEC v. StraightPath Venture Partners, LLC, et al.*, 22 Civ. 3897 (LAK) (S.D.N.Y. filed May 13, 2022). Prior to February 2022, Legend principals and many of its sales agents served as sales agents for StraightPath, and almost 60 percent of Legend's investors, accounting for almost 70 percent of the total funds Legend raised from investors, had previously invested in StraightPath pre-IPO funds.

4. In a similar manner to the solicitations conducted for StraightPath, Legend falsely told investors that it would charge only a 20% fee on profits (if any) earned after the relevant Pre-IPO Company went public. In fact, Legend earned handsome upfront profits from markups on the Pre-IPO Shares that, depending on the Pre-IPO Company at issue, averaged between 46% and 105% above the prices Legend paid. In total, Legend's principals paid themselves more than $9

2

Case 1:23-cv-05426-LAK-JS Document 1 Filed 06/27/23 Page 3 of 19

million and their sales agents received over $3.25 million, despite *none* of the relevant Pre-IPO Companies having gone public to date.

5.      Legend also made other misrepresentations to investors, such as falsely claiming that the investments they were pitching would immediately double or triple in value and that Legend already owned the Pre-IPO Shares it was marketing.

6.      While Legend claimed to stop selling interests in the Legend Funds in October 2022, at least as of May 2023, Legend was still telling investors that it was actively seeking opportunities to purchase Pre-IPO Shares for clients and, as of March 2023, Legend's principals were continuing to buy "lead lists" of prospective investors. And, until at least June 17, 2023, Legend's website remained active and available to the public and advertised investments in specific Pre-IPO Companies through the Legend Funds.

7.      The Commission is seeking emergency relief in this matter because an independent fiduciary is necessary to take over management of Legend and to protect investors in the Legend Funds, which currently hold Pre-IPO Shares or interests in Pre-IPO Shares that Legend purchased for more than $22 million. Court appointment of a receiver will remove these assets from the control of Legend's principals, and permit the receiver to take steps to preserve and marshal additional investor assets and to propose an equitable distribution plan.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Legend has violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

3

9. Unless Legend is restrained and enjoined, it will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)]; Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]; and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

11. The Commission seeks a final judgment: (a) permanently enjoining Legend from violating the federal securities laws and rules this Complaint alleges it has violated; (b) ordering Legend to disgorge the ill-gotten gains it received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Legend to pay a civil money penalty pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (d) ordering any other and further relief the Court may deem just and proper.

12. To maintain the *status quo*, preserve assets sufficient for Legend to pay disgorgement, prejudgment interest, and a civil penalty, and to protect investor assets, the Commission further seeks emergency relief during the pendency of this action including: (a) temporarily and preliminarily enjoining Legend from violating the federal securities laws and rules this Complaint alleges it has violated; (b) appointing a receiver over Legend and the Legend Funds; (c) freezing the assets of Legend and the Legend Funds until such time as the Court appoints a receiver; (d) enjoining the filing of new bankruptcy, foreclosure, receivership, or other actions against Legend and the Legend Funds; (e) requiring Legend to provide a verified accounting; and (f) preventing

4

Legend from destroying, altering, or concealing documents or other evidence or from directing other individuals or entities to do so.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)]; Exchange Act Section 27 [15 U.S.C. § 78aa]; and Advisers Act Section 214(a) [15 U.S.C. § 80b-14(a)].

14. Legend, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. From at least February until October 2022, Legend's primary office was in lower Manhattan. Additionally, certain acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including calls and emails to prospective investors and sales of interests in the Legend Funds to at least ten investors located in Manhattan and elsewhere in this District.

## DEFENDANT

16. **Legend** is a Delaware limited liability company, formed on September 1, 2021, with a principal place of business at relevant times in New York, New York. Legend serves as the manager and investment adviser for the Legend Funds. Legend has never been registered with the Commission in any capacity.

## FACTS

### I. BACKGROUND ON LEGEND

17. From approximately 2019 until February 2022, Legend's principals worked as sales agents for StraightPath, managing boiler rooms they used to sell interests in private pre-IPO funds

5

managed by StraightPath. Legend's principals ultimately raised more money for StraightPath and earned more in commissions (nearly $35 million) than any other group of StraightPath sales agents. More than 45 callers located in these boiler rooms cold-called prospective investors and used sales scripts that were nearly identical to those that would later be used to solicit Legend investors.

18. In or around February 2022, at approximately the same time StraightPath ceased raising money from investors and with the assistance from StraightPath's principals, Legend commenced operations.

19. At times, Legend described itself to prospective investors as the new name for or a new division of StraightPath. But, ultimately, in a manner similar to StraightPath, Legend sold Series interests in its own pre-IPO funds (*i.e.*, the Legend Funds), which purported to invest in seven Pre-IPO Companies over time.

20. Pre-IPO Shares are often held by early stage investors and private company employees and their family members and are not typically widely available to the investing public, including because they are not listed on a national securities exchange. They are attractive to investors due to the potential for high returns in the event the company does make a public offering and there is high demand for its shares, allowing the shares to be sold above their pre-IPO price.

21. Investment advisers like Legend purport to make these sought-after investments accessible to individual members of the investing public, in Legend's case, at allegedly favorable prices.

22. Over time, Legend's principals formed six Legend Funds, although Legend ultimately only offered and sold to investors the securities of five Legend Funds.

23. As described in offering documents and related materials, these five Legend Funds acquired Pre-IPO Shares of various Pre-IPO Companies. Each Series of a Legend Fund was designed to invest in a single Pre-IPO Company's shares.

6

24. In turn, Legend's business model was to sell interests in an applicable Series of a Legend Fund to investors.

25. For example, a Series of "Legend Fund 1" owned Pre-IPO Shares of the Pre-IPO Company Triller. Thus, an investor in a Triller Series of Legend Fund 1 would own a proportionate interest in the Triller Pre-IPO Shares owned by that Series.

26. Even though it was not registered as such with the Commission, Legend acted as the investment adviser to the Legend Funds, as it was compensated for engaging in the business of providing advice to the Legend Funds regarding the advisability of investing in securities.

27. From approximately February through October 2022, Legend sold Series interests in the Legend Funds to at least 321 investors located in 48 states and Bermuda.

28. In total, Legend raised more than $35 million from investors in the Legend Funds.

29. Of that total, Legend raised more than $24 million, or almost 70 percent, from investors who had invested previously in the StraightPath funds. These overlapping investors constituted almost 60 percent of the total number of investors in Legend.

## II. LEGEND'S SECURITIES OFFERINGS

30. Legend's website pitched its offerings as a chance to "buy into . . . exciting emerging companies, some of the hottest on the market, while they're still private and shares are only available to employees and institutions with stock options."

31. To procure investments, Legend operated at least two boiler rooms (which its principals had earlier operated to sell StraightPath fund interests) in lower Manhattan in which more than 45 unregistered sales agents cold-called prospective investors using so-called "lead lists" purchased from third parties. Many of these sales agents made hundreds of phone calls per day to solicit investors.

7

32. On sales calls, Legend's sales agents routinely pitched its offerings as if it were selling actual Pre-IPO Shares to investors, as opposed to Series interests in the Legend Funds.

33. Legend sales agents also falsely represented on sales calls that Legend already owned the Pre-IPO Shares it was marketing through the Legend Funds. This sales pitch was consistent with Legend's website, which stated that "[t]he Funds we work with will only offer shares after it has already secured them . . . ." In many cases, Legend did not actually acquire interests in the Pre-IPO Shares until months after it collected investor money.

34. Typically during the sales calls, Legend sales agents would tell investors that the relevant Pre-IPO Company was likely to go public in the near future and that a supposed existing valuation of the company was, on a per share basis, several multiples of the price that Legend was offering the Pre-IPO Shares (or corresponding Series interests) to investors. Although it had no basis to do so, Legend sales agents often explained to investors that investments in the Pre-IPO Shares Legend was offering would imminently double or triple in value.

35. Legend sales agents further conveyed to prospective investors on sales calls that, unlike other brokers, Legend profited only by taking 20% of an investor's profits when the Pre-IPO Companies went public and did not charge any upfront fees or commissions. This was false because, as Legend sales agents concealed during the sales calls, the firm profited by charging investors exorbitant markups on the Pre-IPO Shares.

36. These false representations during the sales calls as to how Legend made money were consistent with Legend's website, which falsely stated: "The Funds we work with DO NOT charge any upfront fees with this transaction, the only costs involved are charged on the back end of the membership holdings after there is some sort of liquidity event [a]t which time, there will be a 20% fee charged on any profitable portion of your membership holdings, after your initial principle [sic] is recouped." The website further emphasized: "No other fees will be assessed."

8

37. Legend's website made no mention of markups, let alone the exorbitant nature of the markups Legend charged on every investment in the Legend Funds, which as the firm's principals knew or recklessly disregarded, made Legend's pitch regarding how it made money false and misleading.

38. Based on Legend's representations, investors generally understood that they were paying approximately the same price for Series interests backed by Pre-IPO Shares that Legend paid to acquire the Pre-IPO Shares. This understanding was important to investors' decisions to invest in the Legend Funds.

39. If investors had known that Legend was in fact acquiring interests in the Pre-IPO Shares at substantially lower prices, they likely would have looked for other avenues to acquire the Pre-IPO Shares at prices closer to what Legend actually paid for them.

40. Following sales calls, prospective investors would receive an email from Legend that included hyperlinks to documents, including a private placement memorandum ("PPM") for the applicable Legend Fund and a subscription agreement. The email showed the equivalent per-share price at which the Series interests in the relevant Pre-IPO Company were being offered to the investor and attached the signature page of the subscription agreement, which pre-filled the amount the investor had agreed to invest based on the per-share price at which Legend purported to be offering the investment. Neither the email nor the subscription documents made any mention of the amount of the markup that Legend charged investors.

41. After accepting an investment, Legend would often send a "Welcome Letter" confirming that the entire amount of the investor's contribution "has been applied to an investment in approximately" a particular number of "underlying" Pre-IPO Shares of the relevant Pre-IPO Company "at a purchase price" that, when multiplied by the number of shares, equaled the total investment in the corresponding Legend Fund.

9

42. These statements in Welcome Letters were false because, as discussed above, Legend purchased the underlying Pre-IPO Shares for substantially less than the amount it charged investors for the corresponding Series interests.

43. Until on or around June 30, 2022, by which time Legend had already raised approximately $26 million from investors, the PPMs for the Legend Funds stated that Legend "may" charge investors certain upfront fees—including an expense fee (of up to 1 percent), a due diligence fee (of up to 5 percent), and a "placement agent fee" of up to 10 percent.

44. However, the point-of-sale representations Legend made to investors on its website, over the phone, and in Welcome Letters indicated that Legend was communicating to investors that it was not charging these fees. Consistent with this approach, Legend removed reference to these upfront fees from the PPMs for the Legend Funds on or about June 30, 2022.

45. The original PPMs also stated that Legend affiliates "may" charge a "mark-up." The PPMs did not state that Legend charged a large markup on every investment transaction, leaving investors who were told that Legend would only make money after a Pre-IPO Company went public to believe that they were purchasing Series interests backed by Pre-IPO Shares at approximately the same prices paid by Legend.

46. In reality, Legend charged substantial fees on every investment in the form of an undisclosed markup—that is, the difference between the price Legend paid for the Pre-IPO Shares and the price at which it sold corresponding Series interests to investors—which averaged almost 60%, or between 46% and 105% per Pre-IPO Company.

47. Legend did not disclose the size of a single such markup to investors.

48. Legend used this markup to pay upfront compensation to its principals totaling at least $9 million and commissions to its unregistered sales force totaling approximately $3.2 million—all while none of the Pre-IPO Companies Legend marketed have yet to go public.

10

49. As of approximately June 30, 2022, after Legend had already raised around $26 million, Legend revised its PPMs to state that "we are charging a markup" that "will be used to pay expenses of the Fund and to provide compensation to the individuals who oversee the management of the Fund."

50. Nevertheless, even after June 30, 2022, Legend continued to mislead prospective investors through its website and on sales calls, stating that Legend did not make any upfront fees or compensation unless and until there were profits on a public offering by the Pre-IPO Companies. And, even after June 30, 2022, Legend never disclosed the size of its markups.

51. In addition to constituting fraud on the Legend Funds and their investors, Legend's representations concerning its markups were not "permissible by law" (as the PPMs stated any markups would be) because they were principal transactions—knowing sales by Legend as a principal for its own account to its Legend Fund clients—that, pursuant to Advisers Act Section 206(3), required notice and written consent from the affected clients.

52. Legend sold the Pre-IPO Shares it acquired to the Legend Funds as principal and charged the Legend Funds a markup on the transaction. The vast majority of these markups flowed through Legend to its owners and other personnel, who served as investment advisers to the Legend Funds through their ownership and/or work for Legend.

53. Legend never made the required disclosure of these principal transactions or received the required written consent from the Legend Fund investors.

54. Prior to June 30, 2022, no communications to investors disclosed the markups Legend charged, the size of the markups, or the role of Legend (the adviser) in the transactions, and, even as of June 30, 2022, when Legend revised its PPMs, it still failed to provide notice and obtain written consent from its affected clients.

## III. THE OFFERINGS OF SERIES INTERESTS IN THE LEGEND FUNDS VIOLATED THE SECURITIES OFFERING REGISTRATION PROVISIONS

55. Securities Act Section 5 [15 U.S.C. § 77e] makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale.

56. None of the Series interests sold by Legend were sold pursuant to a registration statement filed with the Commission.

57. Legend purported to offer the Series interests on the basis of Rule 506(c) of Regulation D [17 C.F.R. § 230.506(c)], a Commission regulation that provides a safe-harbor registration exemption under Securities Act Section 4(a)(2) for qualifying private offerings.

58. In order to qualify for the Rule 506(c) safe-harbor, all purchasers of the securities sold must be "accredited investors"—that is, for example, individual investors who had a net worth (with their spouse) of more than $1 million or annual income exceeding $200,000 or joint income exceeding $300,000. 17 C.F.R. §§ 230.501(a)(5), (a)(6). In addition, the issuer of the securities must take reasonable steps to verify that the purchasers of the securities are accredited investors, which may include reviewing documentation such as tax records and brokerage or bank account statements. 17 C.F.R. § 230.506(c)(2)(ii).

59. Neither the Legend Funds individually, nor Legend on their behalf, took reasonable steps with respect to the overwhelming majority of the Series interests sold to investors.

60. The investments in the Legend Funds were solicited by unregistered sales agents.

61. For these investors, Legend did little more than collect signed purchaser questionnaires—that is, self-certifications—concerning whether the investor qualified as an accredited investor.

62. Legend almost never verified these claims by collecting any of the types of third-party documents identified in Rule 506(c)(2)(ii).

12

## IV. LEGEND'S SALES EFFORTS VIOLATED THE BROKER-DEALER REGISTRATION PROVISIONS

63. Exchange Act Section 15(a)(1) makes it unlawful for any broker or dealer "to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security" unless such broker or dealer is registered with the Commission. 15 U.S.C. § 78o(a)(1).

64. Legend violated these provisions by hiring, training, and running a vast sales network to sell the Series interests, to which it paid commissions typically generated by the undisclosed markups it charged the Legend Funds for Pre-IPO Shares. Legend's principals then kept the remaining pieces of these markups for themselves.

65. Legend sold Series interests through a network of more than 45 sales agents. Many of these sales agents had previously acted as sales agents for StraightPath, working out of the same boiler rooms (at least two of which were located in Manhattan).

66. Many of these sales agents made cold calls to potential investors using lead lists and sales scripts provided by Legend.

67. The sales agents Legend used were not licensed or associated with registered brokerage firms. In fact, some of these sales agents previously had been barred from working as securities brokers by FINRA, or had otherwise been disciplined by other federal or state authorities.

68. Legend's principals knew that the sales agents they recruited to sell securities for Legend were not associated with a registered broker at the time of those sales.

69. Nevertheless, Legend paid these unregistered sales agents upfront commissions— that is, a percentage of the amounts of money they raised for the Legend Funds.

70. Overall, between approximately February and October 2022, Legend paid a total of more than $3.25 million in commissions to these unregistered sales agents.

13

# FIRST CLAIM FOR RELIEF
## Violations of Securities Act Section 17(a)

71. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 70.

72. Legend, directly or indirectly, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

73. By reason of the foregoing, Legend, directly or indirectly, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

# SECOND CLAIM FOR RELIEF
## Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

74. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 70.

75. Legend, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or

14

more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

76. By reason of the foregoing, Legend directly or indirectly, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Advisers Act Section 206 and Rule 206(4)-8 Thereunder

77. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 70.

78. Legend had an adviser-client relationship with and therefore owed a fiduciary duty to the Legend Funds.

79. From at least February to October 2022, while acting as an investment adviser, Legend, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (i) employed a device, scheme, or artifice to defraud a client or prospective client; (ii) engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon a client or prospective client; (iii) acting as principal for their own account, knowingly sold securities to a client, without disclosing to such client in writing before the completion of such transaction the capacity in which they were acting and obtaining the consent of the client to such transaction; and/or (iv) engaged in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

80. By reason of the foregoing, Legend directly or indirectly, has violated and, unless enjoined, will again violate Advisers Act Section 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

15

## FOURTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and (c)

81. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 70.

82. From at least February until October 2022, Legend, directly or indirectly, and notwithstanding the fact that there was no applicable exemption: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

83. By reason of the foregoing, Legend, directly or indirectly, has violated and, unless enjoined, will again violate Securities Act Sections 5(a) and (c) [15 U.S.C. § 77e].

## FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Sections 15(a)

84. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 70.

85. Legend, while not registered with the Commission as a broker or dealer or associated with a registered broker or dealer, made use of the mails or other means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities other than exempted securities or commercial paper, bankers' acceptances, or commercial bills.

16

86. By reason of the foregoing, Legend, directly or indirectly, has violated and, unless enjoined, will again violate Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter:

### I.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining Legend, its agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### II.

An Order temporarily and preliminarily, until such time as a receiver over Legend and the Legend Funds is appointed, freezing the assets of Legend and the Legend Funds;

### III.

An Order temporarily and preliminarily, and a Final Judgment permanently, appointing a receiver over Legend and the Legend Funds;

### IV.

An Order temporarily and preliminarily, through a Final Judgment, enjoining the filing of any bankruptcy, foreclosure, receivership, or other actions by or against Legend and the Legend Funds;

**V.**

An Order requiring Legend to submit a verified accounting of the assets of Legend and the Legend Funds and the use of all investor funds raised by Legend and the Legend Funds;

**VI.**

An Order temporarily, and preliminarily, through a Final Judgment, enjoining Legend and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access to relevant documents, books and records;

**VII.**

A Final Judgment ordering Legend to disgorge the ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**VIII.**

A Final Judgment ordering Legend to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

## IX.

A Final Judgment granting any other and further relief this Court may deem just and proper.

Dated: June 22, 2023
      New York, New York

                          /s/ Antonia M. Apps
                          ANTONIA M. APPS
                          REGIONAL DIRECTOR
                          Sheldon L. Pollock
                          Steven G. Rawlings
                          Lee A. Greenwood
                          Daniel Loss
                          Suzanne M. Bettis
                          Joshua D. Tannen
                          Attorneys for Plaintiff
                          SECURITIES AND EXCHANGE COMMISSION
                          New York Regional Office
                          100 Pearl Street, Suite 20-100
                          New York, New York 10004
                          212-336-5571 (Loss)
                          LossD@sec.gov

Case 1:23-cv-05326-AKJ Document 1 Filed 06/22/23 Page 19 of 19